IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KIJUAME TAFT, et al.                 : Civ. No. 1:22-CV-02061
                                     :
        Plaintiffs,                  :
                                     :
                                     :
            v.                       :
                                     : (Chief Magistrate Judge Bloom)
KAMEN'S ART SHOPPES, INC.            :
                                     :
        Defendant.                   :

## MEMORANDUM OPINION

### I.    Introduction

This case comes before us on a motion for summary judgment filed by the defendant, Kamen's Art Shoppes, Inc. ("Kamen's"). (Doc. 39). The plaintiffs, Kijuame Taft, Meyia Pender, and Rahshema Council, filed this lawsuit against Kamen's alleging racial discrimination, retaliation, and interference claims pursuant to 42 U.S.C. § 1981. (Doc. 11). The plaintiffs contend that Kamen's racially discriminated against them in the performance of a contract when Evan Eberhardt, an artist employed by Kamen's to draw caricatures[1] at Hersheypark,[2] depicted Pender and

---

[1] "Exaggeration by means of often ludicrous distortion of parts or characteristics." Caricature, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/caricature (last visited April 22, 2025).

[2] A family theme park located in Hershey, Pennsylvania.

her infant son as monkeys.  The plaintiffs also claim that Kamen's retaliated against them and interfered with their ability to perform their contract with Hersheypark when another Kamen's employee, Donald Gentzler, "evicted" them from the park. (Doc. 11 ¶ 11, 13).

Kamen's now moves for summary judgment, arguing that the company is entitled to judgment as a matter of law on the plaintiffs' claims.  After consideration, we conclude that there are no genuine issues of material fact with respect to the plaintiffs' claims and that these claims fail as a matter of law.  Accordingly, we will grant the motion for summary judgment.

## II.  Background

On May 29, 2022, the plaintiffs, Taft, Pender, and Council visited Hersheypark.  (Doc. 41 ¶ 1).  While visiting the park, Pender and her infant son visited a Kamen's kiosk, which offered caricature portraits. (*Id.* ¶¶ 3-4).  Pender stated in her deposition that she observed the caricature drawing for the guests before her, who were Caucasian, and decided to sit for a caricature of her and her son by Kamen's employee, Evan Eberhardt. (*Id.* ¶ 4; Doc. 39-7 at 8).  After Eberhardt completed the drawing, he showed it to Pender and her son and attempted to take

payment for the caricature.  (Doc. 39-5 at 2; Doc. 41 ¶ 7).  Eberhardt claims that Pender giggled when she saw the caricature and asked if she could come back later to pick it up.  (Doc. 39-9 at 6).  Pender claims that when Eberhardt showed her the caricature, she thought it was a joke and walked away to call her father, Taft.  (Doc. 39-7 at 4).

Once Taft and Council arrived at the kiosk, Taft approached Eberhardt and his supervisor, Donald Gentzler.  (Doc. 39-6 at 7).  Taft claims that he approached the stand and complained that the caricature made Pender and her son "look like monkeys, or slaves." (Doc. 41 ¶¶ 17-18).  According to Gentzler, Taft appeared angry and insisted Gentzler admit the caricature was racist and fire Eberhardt.  (Doc. 39-11 at 4-5).  Gentzler testified in his deposition that Taft refused to leave the stand until Gentzler admitted the caricature was racist, which Gentzler would not do.  (*Id.* at 5).  Gentzler ultimately informed Taft that he was going to contact his manager, which made Taft more upset and escalated the situation.  (*Id.* at 4-5).  For his part, Taft stated he did not know why Gentzler called someone else to attempt to resolve the issue, and that he expected Gentzler to confront Eberhardt about the drawing.  (Doc. 39-6 at 8).  According to Gentzler's manager, Erin Halblieb, she was on site at

Hersheypark the day of the incident, but Taft declined Gentzler's offer to have her come to the kiosk. (Doc. 39-10 at 12).

During this encounter Taft claims he was told by Gentzler to leave Hersheypark, which he, Pender, Council, and the rest of their family did after his conversation with Gentzler. (Doc. 39-6 at 10). Gentzler disputes this assertion, stating that while he wanted Taft to leave the kiosk, he did not tell Taft to leave the kiosk or the park. (Doc. 39-11 at 5-6). Gentzler also stated that Taft told him that he would not leave the kiosk until Gentzler admitted that the drawing was racist. (*Id.*). Pender did not participate in the conversation between Taft, Eberhardt, and Gentzler. (Doc. 41 ¶ 23). She stated in her deposition that after Taft finished talking to Gentzler, she wanted to leave the park because she was "over it." (Doc. 39-7 at 5). She further stated that no Kamen's employee called her a monkey or said anything disrespectful towards any of the plaintiffs in relation to their race. (*Id.*). She testified that she believed Eberhardt discriminated against her because of her race due to the way the caricature was drawn in comparison to another caricature she observed prior to sitting down at the kiosk. (*Id.* at 7-8). Ultimately,

none of the plaintiffs paid for the drawing, and they did not take the caricature with them when they left the park. (Doc. 41 ¶¶ 27-29).

After the interaction with Taft, Eberhardt and Gentzler took the drawing to show Halblieb and explained what happened during their conversation with Taft. (Doc. 41 ¶ 58). Gentzler also told Halblieb that none of the plaintiffs left their names or phone numbers, so they could be reached after the incident. (Doc. 39-11 at 6).

Three months after the incident, Taft reached out to Hersheypark guest services to complain about the caricature. (Doc. 41 ¶ 65). After Hersheypark notified Kamen's of the complaint Halblieb immediately contacted Taft and offered another drawing and shipping at no cost. (*Id.* ¶ 66; Doc. 39-10 at 12). According to Halblieb, Taft was upset by her offer and insisted that Kamen's offer "more" and admit that Kamen's was racist. (Doc. 39-10 at 16).[3] Taft also brought up the caricature of the

---

[3] Halblieb also testified in her deposition that during this call, Taft "bullied" and "harass[ed]" her, called her a "white privileged woman," and insisted that she admit that the artist, the company, and the entire state of Pennsylvania was "racist." (Doc. 39-10 at 19-20). She further testified that Taft brought up litigation against another theme park that was being sued for allegedly racist behavior, and that Taft "threaten[ed]" her by saying that his lawyers would be calling her. (*Id.*).

Caucasian couple who sat before Pender, insisting that caricature was also done by Eberhardt and was drawn better; however, Halblieb disputed that the first caricature was done by Eberhardt based on her knowledge of the artists' work and the signatures on each drawing. (Doc. 39-10 at 23). Kamen's Human Resources manager, Erin Brazill, also reached out to the plaintiffs and offered to have the caricature redrawn by a more experienced artist and shipped to their home at no cost. (Doc. 39-12 at 5). The plaintiffs refused, allegedly stating that they wanted Brazill to admit that the drawing looked like animals. (*Id.*).

On December 29, 2022, the plaintiffs filed their original complaint against Kamen's. (Doc. 1). The plaintiffs amended their complaint on May 23, 2023, alleging claims of racial discrimination, retaliation, and interference pursuant to 42 U.S.C. § 1981. (Doc. 11). Kamen's now moves for summary judgment, arguing that the plaintiffs' claims fail as a matter of law because the plaintiffs failed to produce evidence to show intent to discriminate, each plaintiff engaged in a protected activity in order to state a claim for retaliation, and that there was a contractual relationship with which Kamen's interfered. (Doc. 40).

6

After consideration, we conclude that there are no genuine issues of material fact and that the plaintiffs' claims fail as a matter of law. Accordingly, we will grant the defendant's motion for summary judgment.

## III.   Discussion

### A. Motion for Summary Judgment – Standard of Review

The defendant has filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Rule 56(a) provides that a court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The materiality of the facts will depend on the substantive law.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  Thus, "[o]nly disputes over facts that might affect the outcome of the suit under governing law" will preclude summary judgment.  *Id.*  A dispute is only genuine if a reasonable juror could find in favor of the nonmoving party.  *Id.*

The moving party bears the initial burden to "demonstrate the absence of a genuine issue of material fact," relying on pleadings, depositions, affidavits, and other evidence in the record.  *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986).  If the movant "successfully points to evidence of all of the facts needed to decide the case on the law," the nonmovant can still defeat summary judgment by pointing to evidence in the record which creates a genuine dispute of material fact and from which a jury could find in its favor.  *El v. Southeastern Pennsylvania Transp. Auth. (SEPTA)*, 479 F.3d 232, 238 (3d Cir. 2007).  However, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).  A court may not make credibility determinations or weigh the evidence, but "must view the facts in the light most favorable to the non-moving party."  *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

## B. The Defendant's Motion for Summary Judgment will be Granted.

Our review of Kamen's motion for summary judgment reveals that there are no genuine disputes of material fact regarding any of the plaintiffs' § 1981 claims and that the claims fail as a matter of law. Although the plaintiffs assert that the caricature was "so offensive" that intentional discrimination must be inferred, there is no evidence in the record to suggest that Kamen's or any of its employees intended to

discriminate against or interfere with the plaintiffs' ability to contract based on their race. Because the plaintiffs cannot establish an underlying § 1981 violation, their § 1981 retaliation claim also fails. However, considering the merits of the retaliation claim, this claim fails because although there is a dispute over whether a Kamen's employee told the plaintiffs to leave the park, accepting the plaintiffs' version of events as true, Kamen's can offer a legitimate and non-discriminatory reason for the alleged actions. The plaintiffs point to no evidence to show that the reason was a pretext for retaliation. Accordingly, we will grant the defendant's motion for summary judgment.

### 1. Racial Discrimination

Section 1981 "protects the equal right of '[a]ll persons within the jurisdiction of the United States' to 'make and enforce contracts' without respect to race." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474-75 (2006) (quoting 42 U.S.C. § 1981(a)). This includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* at 475 (quoting § 1981(b)). To state a claim of discrimination under § 1981 in this context, a plaintiff must show: (1)

membership in a racial minority; (2) intentional discrimination based on race; and (3) "discrimination concerning ... the right to make and enforce contracts." *Brown v. Philip Morris Inc.*, 250 F.3d 789, 797 (3d Cir. 2001) (quotations and citation omitted). Discriminatory intent may be shown through evidence of "disparate impact, departure from procedural norms, a history of discriminatory conduct, or other relevant facts, but may not be established by conclusory allegations of generalized racial bias." *Lee v. Delta Air Lines, Inc.*, 38 F. Supp. 3d 671, 675 (W.D. Pa. 2014) (citing *Flagg v. Control Data*, 806 F. Supp. 1218, 1223 (E.D. Pa. 1992)).

The plaintiffs concede that only Pender has standing to sue for racial discrimination pursuant to § 1981. (Doc. 43 at 3). Therefore, we will grant summary judgment with respect to the racial discrimination claims asserted by Taft and Council.

As to Pender's racial discrimination claim, Kamen's argues that there is no evidence to support the assertion that anyone from Kamen's intentionally discriminated against Pender because of her race. (Doc. 40 at 6-7). Kamen's points to Pender's testimony in which she admits that Eberhardt and Gentzler did not say anything to her in relation to her race and did not speak to her in a disrespectful manner. (Doc. 39-7 at 7).

Although Kamen's managers conceded that the caricature was not drawn well, as Gentzler, Halblieb, and Brazill admit in their depositions, there is nothing in the record to suggest that any Kamen's employee had intent to discriminate against Pender. (Doc. 39-10 at 23; Doc. 39-11 at 5). Eberhardt himself admitted to Halblieb that the caricature was not well drawn and that at the time he drew the caricature of Pender and her son, he was still learning how to draw caricatures. (Doc. 39-10 at 24; Doc. 39-9 at 5). Additionally, Kamen's did not make Pender or any of the other plaintiffs pay for the drawing and offered to re-draw and ship a new caricature for no cost. (Doc. 39-10 at 14).

Pender argues that racial discrimination must be inferred because her drawing was objectively offensive compared to the caricature of the Caucasian couple that they claim was drawn by Eberhardt. She alleged that she sat for the caricature because she saw the other couple's caricature and thought it was drawn well. Additionally, Pender asserts that she observed Eberhardt draw the Caucasian couple's caricature and Taft stated in his testimony that he believed that the artists' initials on both drawings match. (Doc. 39-6 at 7, 18; Doc. 39-7 at 4). Kamen's disputes this assertion, stating that the caricature of the Caucasian

couple referenced by Pender was not drawn by Eberhardt based on Halbleib's knowledge of the artists and her testimony that the caricature of the Caucasian couple was drawn by Gentzler. (Doc. 39-10 at 16).

Pender stated in her deposition that she did not know what a caricature was, but she believes that Kamen's racial intent is evidenced by the exaggerated features, the colors and because the caricature she observed before hers was well drawn in comparison. (Doc. 39-7 at 8; Doc. 43 at 4). The plaintiffs rely on *Danao v. ABM Janitorial Services*, 142 F. Supp. 3d 363, 375-76 (E.D. Pa. 2015) to assert that the alleged depiction of monkeys is enough to support an inference of racial discrimination.[4] We are first constrained to note that, in this case, the plaintiffs—not anyone employed by the defendant—are the only individuals who have used the word "monkey"[5] to describe the caricature drawn by Eberhardt.

---

[4] The plaintiffs also cite to *Gladden v. Ambler Healthcare Group, LLC*, No. 21-4483, 2022 WL 17721055, at *7 n.6 (E.D. Pa. 2022) which supports the assertion that the use of the word "monkey" has been used in racial harassment claims in the past and was decided at the summary judgment stage. However, in *Gladden*, the court ultimately determined that the defendant's verbal use of the word "monkeys" in that specific context fell short in suggesting any racial animus. *Id.*

[5] Curiously, in his deposition, when asked what about the picture resembled a monkey, Taft replied: "Oh, man. It is a lot. *It ain't a monkey, it's a chipmunk.* They both -- it is terrible. . . ." (Doc. 39-6 at 6) (emphasis

(*See e.g.*, Doc. 36-6 at 7; Doc. 39-8 at 6).  While the *Danao* court found that the use of the word "monkey" was sufficient at the motion to dismiss stage to support an inference of intentional racial discrimination, even the *Danao* court remarked that in that case, the "[p]laintiff's claim of racial discrimination stands on particularly tenuous grounds." *Danao*, 142 F. Supp. 3d at 376.  Significantly, the instant case is at the summary judgment stage, where a plaintiff must set forth more than just a subjective belief of discrimination because of her race.  *See e.g.*, *Tucker v. Thomas Jefferson Univ.*, 484 F. App'x 710, 712 (3d Cir. 2012) (finding that "the subjective belief that race played a part in [the alleged discriminatory conduct] is insufficient" at the summary judgment stage); *Sullivan v. Nationwide Life Ins. Co. of Amer.*, 720 F. Supp. 2d 483, 510 (D. Del. 2010) (granting summary judgment on a racial discrimination claim finding that the "[p]laintiff needs more than his subjective belief to survive summary judgment . . . .").

Here, the only evidence that the plaintiffs rely on to support an inference of discrimination is the subjective belief that the drawing

---

added). However, the plaintiffs do not argue that a depiction of a chipmunk is a racial stereotype.

depicted the plaintiffs as "monkeys," as characterized by the plaintiffs themselves. Even if we assume that Eberhardt drew both the caricature of the Caucasian couple and the caricature of Pender and her son, the differences in the caricatures alone does not suggest an intent to discriminate based on the plaintiffs' race. Viewing the evidence in a light favorable to Pender as the nonmovant, her subjective belief that the caricature was racist is simply insufficient at this stage to survive the instant summary judgment motion, particularly where the overwhelming amount of record evidence shows no intent to discriminate by any Kamen's employee. Accordingly, we conclude that the plaintiffs have failed to set forth evidence from which a factfinder could conclude that Kamen's had an intent to discriminate or deprive Pender of her § 1981 rights based on her race. Accordingly, we will grant Kamen's motion for summary judgment with respect to the racial discrimination claim.

2. <u>Interference</u>

The plaintiffs also bring a claim of interference, alleging that they were "evicted" from Hersheypark by Kamen's staff after Taft complained of racial discrimination. Section 1981 imposes liability on a third party that intentionally interferes, "on the basis of race, with another's right to make and enforce contracts." *McClease v. R.R. Donnelley & Sons Co.*, 226 F. Supp. 2d 695, 699 (E.D. Pa. 2022) (citations omitted). A plaintiff raising such a claim of interference must establish "that he was actually denied the ability either to make, perform, enforce, modify, or terminate a contract, or to enjoy the fruits of a contractual relationship, by reason of race-based animus." *Burns v. SeaWorld Parks & Entertainment, Inc.*, 675 F. Supp. 3d 532, 541 (E.D. Pa. 2023) (citations and quotations omitted).

The plaintiffs' interference claim is based on their allegations that Kamen's staff told them they had to leave the park, thereby interfering with their contractual right to remain in the park. As we concluded at the motion to dismiss stage, the plaintiffs have shown a contractual relationship with Hersheypark based on the purchase of tickets for admission to the park. (Doc. 30 at 9). Taft claims that Gentzler told him to leave the park, after which he packed up his family and left. (Doc. 39-

6 at 10). But Gentzler stated that while he wanted Taft to leave the kiosk because of the way Taft escalated the situation, he never told Taft or any of the plaintiffs they had to leave the kiosk or the park. (Doc. 39-11 at 6-7). Further, Pender testified in her deposition that she wanted to leave the park and was "over it." (Doc. 39-7 at 5). All the plaintiffs stated that the exchange with the Kamen's employees took place at the end of the day around the time that the park was closing. (Doc. 39-6 at 10-11; Doc. 39-7 at 3; Doc. 39-8 at 4). Gentzler and Eberhardt also testified that the encounter took place toward the end of the day. (Doc. 39-9 at 7; Doc. 39-11 at 4).

Viewing the evidence in a light most favorable to the plaintiffs, we conclude that no reasonable juror could find in the plaintiffs' favor on their interference claim. Even if we accept Taft's version of events—that Gentzler told Taft he and his family had to leave—no reasonable juror could find that this directive, which all parties agree would have occurred toward the end of the day, interfered with the plaintiffs' contract with Hersheypark. As the defendant notes, every individual who patronizes a theme park ultimately leaves the park at some point after paying to enter. (Doc. 46 at 9). Thus, a statement from one of Kamen's employees

telling the plaintiffs to leave the park at or around the time that the park is closing could not plausibly be construed as interfering with the plaintiffs' contractual relationship with Hersheypark based on their admission tickets.

Nor could a juror conclude that the directive to leave the park was predicated on race-based animus. Rather, the evidence in the record establishes that Taft made a complaint to Kamen's and then escalated the situation to a point where Kamen's staff felt threatened. Eberhardt testified that Taft verbally threatened to hurt him (*see* Doc. 39-9 at 7 ("The part that was threatening was the fact that he said he wanted to grab someone else to come down here to hurt me."); and Gentzler stated that he was "scared [Taft] might do something if I kept saying the truth, that it wasn't racist. (Doc. 39-11 at 5). Thus, in our view, no reasonable juror could conclude that Kamen's interfered with the plaintiffs' contract with Hersheypark because of their race.[6]   We will therefore grant

---

[6] We also note that there is no evidence in the record that the employees of Kamen's, a third-party vendor that contracts with Hersheypark and other theme parks (*see* Doc. 39-10 at 4), had any authority to "evict" the plaintiffs from the park.

summary judgment in favor of the defendant on the plaintiffs' interference claim.

### 3. Retaliation

Section 1981 also encompasses claims of retaliation for reporting discriminatory conduct. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 451-52 (2008). Such claims follow the same framework as Title VII retaliation claims and require a plaintiff to show that "(1) he engaged in protected activity, (2) that [the defendant] took an adverse [ ] action against him, and (3) there was a causal connection between his participation in the protected activity and the adverse [ ] action." *Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 798 & n.14 (3d. Cir. 2010) (citing *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006)). Further, the plaintiff must demonstrate that there was "an underlying section 1981 violation." *Id.* (citing *CBOCS West, Inc.*, 553 U.S. at 451-52). If the plaintiffs can establish a prima facie case of retaliation, then the burden shifts to the defendant to provide a legitimate non-retaliatory reason for its conduct. *Id.* If the defendant can provide such a reason, then the plaintiff must show that the defendant's provided reason was a pretext for retaliation. *Id.*

Because the plaintiffs failed to establish an underlying § 1981 violation, their retaliation claim must fail. However, addressing the merits of the retaliation claim, it must still fail because Kamen's has provided a legitimate non-discriminatory reason for its conduct, and there is no evidence in the record from which the plaintiffs can establish that this reason was a pretext for retaliation.

The plaintiffs assert that they engaged in protected activity when they complained to Gentzler and Eberhardt about the caricature. (Doc. 11 ¶¶ 12-13). Neither Pender or Council ever directly spoke to anyone at Kamen's to complain about the drawing and therefore could not have engaged in protected activity. (See Doc. 39-7 at 4; Doc. 39-8 at 4). Taft was the only plaintiff that made complaints to Gentzler and Eberhardt at the park and therefore the only one who could have engaged in protected activity. (Doc. 39-6 at 7-8, Doc. 39-11 at 7). Next, assuming Gentzler told Taft that he had to leave the park, there could be a causal connection between Gentzler's adverse action (telling Taft to leave the park) and Taft's complaint because Taft was allegedly asked to leave shortly after making his complaint to a Kamen's employee.

19

Because Taft can establish a prima facie case of retaliation, Kamen's must provide a legitimate non-discriminatory reason for its alleged conduct. In his deposition, Eberhardt stated that Taft was upset and threated him and Gentzler. (Doc. 39-9 at 7). Gentzler similarly stated that Taft grew increasingly frustrated, that the situation had escalated, and that he felt scared during their encounter. (Doc. 39-11 at 5). Accordingly, the defendant meets the relatively low burden of providing a legitimate, nonretaliatory reason for the alleged action taken. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (characterizing the defendant's burden at this stage as "relatively light"). Further, viewing the evidence in a light most favorable to the plaintiffs, no reasonable juror could find that Gentzler's alleged request for the plaintiffs to leave the park was a pretext for retaliation. Rather, if made, the request was made in response to the confrontational encounter. Accordingly, the plaintiffs' retaliation claim fails, and summary judgment will be granted in favor of the defendant.

## IV.  Conclusion

For the foregoing reasons, the defendant's motion for summary judgment (Doc. 39) will be GRANTED.

An appropriate order follows.

Submitted this 22nd day of April 2025.

*s/ Daryl F. Bloom*
Daryl F. Bloom
Chief United States Magistrate Judge
